*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JAMES WILLIAM DAGGETT and NADIA TORA DAGGETT, ) ) ) | Supreme Court Nos. S-15799/15819 |
| Appellants and Cross-Appellees, ) ) ) | |
| ) | Superior Court No. 3HO-11-00359 CI |
| v. ) | |
| ) | O P I N I O N |
| RICHARD L. FEENEY, ) | |
| ) | No. 7179 – June 16, 2017 |
| Appellee and Cross-Appellant. ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Homer, Charles T. Huguelet, Judge.

Appearances: James William Daggett and Nadia Tora Daggett, pro se, Anchorage, Appellants. Lindsay Wolter, Homer, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

CARNEY, Justice.

## I. INTRODUCTION

A property owner cancelled a contract to install a wind turbine on his property and sued the contractor to recover his down payment. The contractor filed a counterclaim for breach of contract. The superior court concluded that the contractor was required to be licensed by the State and had misrepresented its licensing status. It

also concluded that the contractor could not maintain the counterclaim because the contractor was unregistered. The court ordered the contract rescinded and the contractor to return the down payment less a setoff covering costs incurred in the transaction. The contractor failed to pay and the court amended the judgment to include the contractor's individual owners and a successor company. The contractor's individual owners appeal the licensing determination and the amended judgment. The property owner cross-appeals the setoff calculation. We conclude that the court erred only in its setoff calculation.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

This case involves a cancelled contract between Richard Feeney and Alaskan Wind Industries (AWI), a renewable energy contractor, for the sale and installation of a wind turbine on Feeney's property in Homer. AWI was the trade name for Daggett LLC, owned by James and Nadia Daggett. The Daggetts owned several similarly named organizations, as well as Standard Steel, Inc.

Feeney and his wife, Elizabeth Bashaw, began discussing the purchase of a wind turbine with AWI representatives in the summer of 2009. In these discussions AWI was often represented by sales representative Erik Schreier and occasionally by Nadia Daggett. The parties dispute whether Schreier told Feeney and Bashaw that AWI was licensed[1] and bonded as a steel erection contractor and whether Schreier promised to make sure neighboring landowners would not oppose the turbine's installation. But the parties agree that they discussed AWI's successful installation of another turbine in the same area without opposition from neighboring landowners.

---

[1]    The parties and the superior court frequently used the term "license" to refer to registration under AS 08.18.011-.061.

The parties ultimately signed a contract in October 2010, with Schreier signing on behalf of AWI. The contract was on AWI letterhead and did not mention Daggett LLC. It required AWI to provide and install a wind turbine, a 49-foot tower, and an inverter. The contract expressly affirmed that AWI was "qualified by law as a licensed steel erector in the state of Alaska" and allocated to Feeney the responsibility for "meet[ing] all builders['] permit requirements, variances, [and] height restriction waivers."

Bashaw paid the 60% down payment of $32,880 immediately after the contract was signed. AWI then ordered the wind turbine from a California-based supplier and had it shipped to Alaska. AWI began digging the turbine's foundation in November 2010. The work was soon stopped by Bashaw because a neighbor was concerned that the 49-foot turbine would violate a subdivision land-use covenant. AWI agreed that Feeney and Bashaw could take a few months to resolve the conflict with their neighbor.

In late November the neighbor formally notified Feeney and Bashaw of a land-use covenant that prohibited structures over 35 feet tall in the subdivision and threatened legal action if the project moved forward. In December Bashaw emailed Nadia Daggett saying, "We need to get this contract cancelled as soon as possible, especially since it is illegal and you were aware that was so when it was signed." Despite discussions during the first half of 2011 to try to reach a mutually agreeable solution regarding contract cancellation and refund, the parties were unable to reach an agreement.

## B.   Proceedings

Feeney filed suit in early December 2011, naming AWI, James Daggett, and Nadia Daggett as the defendants. Feeney alleged that AWI and its representatives had "assured" him that they were familiar with the subdivision covenants, that the wind

turbine would not violate them, and that AWI would check with Feeney's neighbors to make sure they did not object to the turbine. Feeney asked the court to rescind the contract and order the return of his down payment, "less any offset which the court deems appropriate"; he also requested an accounting to determine the offset amount.

AWI's answer admitted that it had entered into a contract with Feeney and asserted wrongful rejection of the turbine delivery as an affirmative defense. AWI also filed a counterclaim, alleging that Feeney had materially breached the contract by refusing to accept full performance and pay the full price for the turbine. James and Nadia Daggett filed separate answers raising affirmative defenses that they were not party to the contract between Feeney and AWI and were not liable to Feeney under AS 10.50.265, which limits LLC members' liability to third parties.[2]

Feeney replied to AWI's counterclaim and amended his complaint seeking to pierce the corporate veil and reach the Daggetts personally because of some confusion about the Daggetts' various corporate entities.[3] Feeney expanded his claim for contract rescission, alleging that rescission was justified because "AWI was not registered as a general or specialty contractor with the State of Alaska" when it entered the contract, as required by state law. Having discovered that AWI was no longer a registered business and that the Daggetts had set up a new entity under the name Standard Steel, Inc., Feeney also sought to add Standard Steel as a defendant.

---

[2] AS 10.50.265 provides that "[a] person who is a member of a limited liability company or a foreign limited liability company is not liable, solely by reason of being a member, under a judgment, decree, or order of a court, or in another manner, for a liability of the company to a third party."

[3] Because the superior court ultimately concluded that the correct entity was Daggett LLC d/b/a Alaskan Wind Industries, we use that name throughout.

A two-day bench trial took place in Homer in November 2012. Feeney testified that he had specifically asked Schreier whether AWI was a licensed and bonded contractor and that Schreier had affirmed AWI was licensed and bonded. Feeney explained that this information was important to him in deciding to purchase the wind turbine. Schreier testified that Feeney had never asked about AWI's licensing status.

Nadia Daggett testified that she and James had believed wind energy installers were not required to be licensed as construction contractors at the time of the contract with Feeney. She stated that "[i]t was industry standard" not to carry a license at the time and claimed that none of AWI's competitors had done so. Nadia also testified that she had contacted the State and had been told there was no North American Industry Classification System (NAICS)[4] code for renewable energy installers. She further testified that in late 2010 a state licensing inspector had told them that renewable energy contractors would be required to be licensed beginning in 2011.

The superior court issued a written opinion in favor of Feeney in July 2013. The court decided that Feeney was entitled to rescission on the ground of misrepresentation[5] because AWI had misrepresented its licensing status, noting that "the

---

[4]   AS 43.70.020(a)(2) requires business licenses to include the lines of business to be conducted, and the State uses some NAICS codes to determine lines of business for this purpose. *What is "Line of Business" or "LOB"?* and *"What is "NAICS"?*, in *Line of Business/Alaska NAICS Code*, DEP'T OF COMMERCE, CMTY., AND ECON. DEV., DIV. OF CORPS., BUS. & PROF'L LICENSING, https://www.commerce.alaska.gov/web/cbpl/BusinessLicensing/AKLOBandNAICS.aspx (last visited Apr. 7, 2017).

[5]   *See Foster v. Cross*, 650 P.2d 406, 409 (Alaska 1982) (holding that, to void a contract, a party must show that the other party "made a false representation of material fact which was actually and justifiably relied upon" (first citing *Cousineau v. Walker*, 613 P.2d 608, 612 (Alaska 1980); then citing *Halpert v. Rosenthal*, 267 A.2d 730, 733 (1970); and then citing RESTATEMENT (SECOND) OF CONTRACTS § 164(1) (AM. LAW

(continued...)

[c]ontract itself expressly establishe[d] that '[AWI was] qualified by law as a licensed steel erector in the State of Alaska.' " The court concluded that wind energy installers were required to be licensed as steel erection contractors because tower-mounted wind turbines qualify as "steel towers and pylons" under regulations[6] adopted pursuant to AS 08.18.013[7] and AS 08.18.024.[8] And the court found that AWI had been "neither licensed nor bonded as a 'steel erection contractor' " when the contract was executed.

The superior court noted that there was "evidence to suggest" that AWI had known it needed to be licensed because it had previously held a specialty contractor license which expired in 2009, before execution of the contract. The court found AWI's representation of its licensing status to be a misrepresentation of a material fact, and it pointed to Feeney's testimony that he would not have entered into the contract without it. The court therefore concluded that Feeney was entitled to rescission of the contract based on AWI's misrepresentation of its non-licensed status because he " 'actually and justifiably relied upon' a 'false representation of a material fact.' "[9] The court accordingly ruled that Feeney was entitled to reimbursement of his down payment.

But the superior court noted that Feeney's position on the issue of licensing appeared "pretextual." It believed Feeney had "unilaterally cancelled" the contract to

---

[5]     (...continued)
INST. 1981))).

[6]     *See* 12 Alaska Administrative Code (AAC) 21.510(a)(3) (2012).

[7]     AS 08.18.013 authorizes regulations that categorize and require the registration of contractors.

[8]     AS 08.18.024 describes specialty contractors.

[9]     *See Foster*, 650 P.2d at 409 (citing *Cousineau*, 613 P.2d at 612; *Halpert*, 267 A.2d at 733; RESTATEMENT (SECOND) OF CONTRACTS § 164(1)).

avoid the threatened suit from his neighbor and doubted he would have objected to AWI's non-licensed status without that threat. The court suggested it would take this into account as an equitable consideration in determining AWI's recovery amount.

The superior court also addressed AWI's counterclaim for breach of contract. Although it was "inclined to entertain the merits" of AWI's counterclaim because Feeney's termination of the contract was "suspect," the court concluded that the counterclaim was barred by AS 08.18.151, which provides that a contractor "may not bring an action . . . for breach of a contract for which registration is required" unless the contractor can show it "was a registered contractor . . . at the time of contracting." Having already decided AWI was required to be licensed as a steel erection contractor and was not licensed at the time of the contract, the superior court concluded AWI was barred from bringing the counterclaim. The court rejected the Daggetts' argument that AWI was exempt from AS 08.18.151 under the "finished products" exemption expressed in AS 08.18.161(5), because the wind turbine "bec[a]me a permanent, fixed part of a structure" and was not a finished product as contemplated in the exemption.

Nonetheless the superior court explained that even an unlicensed contractor may recover "any sums which may be equitably due [it]" through a setoff against the damages to be paid. It relied on *Sumner Development Corp. v. Shivers*, in which we held that a setoff against the plaintiff's recovery is appropriate if a contract has been partially performed and the plaintiff would receive a windfall from retaining the benefit of the partially performed work in addition to receiving contract damages.[10] Here the court allowed a setoff because Feeney was "not without unclean hands" and "AWI suffered substantial financial loss as a result of" Feeney's cancelling the contract.

---

[10]    517 P.2d 757, 765-66 (Alaska 1974) (quoting *S & Q Constr. Co. v. Palma Ceia Dev. Org.*, 3 Cal. Rptr. 690, 692 (Cal. Dist. Ct. App. 1960)).

The superior court determined that AWI was entitled to a setoff for any resale costs, out-of-pocket costs, and incidental costs it had incurred in partially performing the contract. It did not award a setoff for resale costs because it calculated that AWI had not lost money on resale but instead made a small profit. The court awarded out-of-pocket expenses that were incurred following execution of the contract, which included commissions, the cost of shipping the turbine to Alaska, and the materials, equipment, and labor used to begin creating the foundation. The court also awarded certain incidental expenses mainly related to moving the turbine to its new purchaser. The total setoff was $9,609.06.

The superior court expressly withheld judgment on the question whether Feeney could seek recovery of his down payment from anyone other than AWI. But the court concluded that if Feeney was not able to recover his reimbursement from AWI, it would "consider whether Defendants James and Nadia Daggett, or any entity registered to them or otherwise owned by them, should be held liable."

In December 2013 the superior court issued a final judgment awarding Feeney $23,270.94 in damages (the amount of the down payment minus AWI's equitable setoff), plus pre- and post-judgment interest, attorney's fees, and court costs, for a total of $36,010.15. The court authorized Feeney to seek to amend the judgment to permit recovery from the other defendants if AWI failed to satisfy the judgment within 90 days, suspending the ordinary timeline established by Alaska Civil Rule 59(f) and allowing Feeney to file within 120 days of the entry of judgment.

When AWI did not satisfy the judgment within 90 days, Feeney filed a motion to amend the final judgment, naming James Daggett, Nadia Daggett, and Standard Steel as additional defendants. The Daggetts objected to both their individual liability and that of Standard Steel. They also opposed the superior court's decision to allow Feeney to move to amend after the Civil Rule 59(f) time limit had expired.

The superior court issued an amended final judgment in December 2014. The court found that the "primary contractor entity" Feeney had contracted with was Daggett LLC d/b/a AWI, but that Feeney had not had notice that Daggett LLC was the principal because the contract named only AWI and "did not disclose the existence of" Daggett LLC. And the court explained that because the contract only used the AWI trade name, Feeney was not given notice that he was contracting with a limited-liability entity. The court therefore concluded that James and Nadia Daggett were personally liable to Feeney as agents of an undisclosed principal on the contract, with Erik Schreier acting as their subagent.[11]

The superior court also concluded that Standard Steel was liable to Feeney as AWI's successor under the "mere continuation" and "continuity of enterprise" exceptions to the general rule that a corporation is not liable for its predecessor's acts.[12] The court found that Standard Steel was "simply a change in name and corporate form" from Daggett LLC, noting that Standard Steel continued the LLC's renewable energy and wind turbine installation business at the same address and website; that "[t]he Daggetts remained the sole stockholders and officers of the new entity"; and that the new entity did business as "Alaska's Wind Industries," a "negligible change" from its previous name. The court thus concluded that Standard Steel was liable to Feeney as the successor to AWI.

---

[11] *See Jensen v. Alaska Valuation Serv., Inc.*, 688 P.2d 161, 163 (Alaska 1984) ("An agent who makes a contract for an undisclosed or partially disclosed principal will be liable as a party to the contract." (citing RESTATEMENT (SECOND) OF AGENCY, §§ 321, 322 (AM. LAW INST. 1958))).

[12] *Savage Arms, Inc. v. W. Auto Supply Co.*, 18 P.3d 49, 55-56 (Alaska 2001) (explaining doctrine of successor liability).

James and Nadia Daggett represent themselves in this appeal of the superior court's initial decision issued in July 2013, the final judgment issued in December 2013, and the amended final judgment issued in December 2014. They contest multiple elements of these rulings. Feeney cross-appeals the court's determination of AWI's setoff amount.

## III. STANDARD OF REVIEW

"Interpretation of a statute is a question of law to which we apply our independent judgment; we interpret the statute according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[13] For mixed questions of law and fact, including applications of agency law,[14] we review legal questions de novo and review factual findings for clear error.[15] "A fact finding is not clearly erroneous unless the reviewing court has a definite and firm conviction that a mistake has been made."[16]

"We review the grant of an equitable remedy . . . for abuse of discretion, but we review de novo any underlying questions of law and the application of law to facts."[17]

---

[13] *Adamson v. Municipality of Anchorage*, 333 P.3d 5, 11 (Alaska 2014) (citing *Grimm v. Wagoner*, 77 P.3d 423, 427 (Alaska 2003)).

[14] *See Foster v. Cross*, 650 P.2d 406, 408 (Alaska 1982).

[15] *Diblik v. Marcy*, 166 P.3d 23, 25 (Alaska 2007) (first citing *Forshee v. Forshee*, 145 P.3d 492, 497 (Alaska 2006); then citing *Keturi v. Keturi*, 84 P.3d 408, 412 (Alaska 2004)).

[16] *Id.* at 25-26 (citing *Keturi*, 84 P.3d at 412).

[17] *In re Estate of Fields*, 219 P.3d 995, 1002 (Alaska 2009), *as modified on denial of reh'g* (Dec. 16, 2009) (citing *Riddell v. Edwards*, 76 P.3d 847, 852 (Alaska (continued...)

Whether a party has standing to assert a given claim is a question of law that we review de novo.[18]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Concluding That AWI Was Required To Be Registered As A Specialty Contractor.

The Daggetts argue that the superior court was wrong to conclude AWI was required to be registered as a specialty steel erection contractor, asserting that AWI was exempted by an express exception covering contractors who install "finished products." Feeney counters that wind turbine installation does not fall under the finished products exemption. We conclude that the superior court correctly interpreted the statute and regulations.[19]

---

[17]    (...continued) 2003)).

[18]    *Keller v. French*, 205 P.3d 299, 302 (Alaska 2009) (citing *St. Paul Church, Inc. v. Bd. of Trs. of the Alaska Missionary Conference of the United Methodist Church, Inc.*, 145 P.3d 541, 549-50 (Alaska 2006)).

[19]    In their statement of points on appeal, the Daggetts also challenge the superior court's finding that AWI misrepresented its licensing status and the court's subsequent conclusion that this misrepresentation was grounds for rescission. But they do not explicitly contest these issues in their appellate briefing. In general, "issues not briefed or only cursorily briefed are considered waived." *Shearer v. Mundt*, 36 P.3d 1196, 1199 (Alaska 2001) (citing *Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n.3 (Alaska 1991)). Because self-represented litigants are held to a less demanding procedural standard, we will consider a self-represented litigant's argument if his or her "briefing was such that [the court] could discern [the party's] legal arguments and [the opposing party] could reply to them." *Mitchell v. Mitchell*, 370 P.3d 1070, 1083 (Alaska 2016) (alterations in original) (quoting *Peterson v. Ek*, 93 P.3d 458, 464 n.9 (Alaska 2004)). Feeney's brief does not discuss the issues. Even under the more lenient standard for self-represented litigants, the Daggetts have waived this issue on appeal.

### 1.    The statute requires registration.

Alaska Statute 08.18.171(4) defines a contractor as "a person who, in the pursuit of an independent business, undertakes or offers to perform . . . or submits a bid for a project to construct, alter, repair, move, or demolish a building . . . or any type of fixed structure, including excavation and site development and erection of scaffolding." It further provides that " 'contractor' includes a general contractor, builder, mechanical contractor, specialty contractor, and subcontractor." Alaska Statute 08.18.011 requires all contractors to be registered with the Alaska Department of Commerce, Community, and Economic Development.[20]   Alaska Statutes 08.18.013 and .024 authorize the Department to register and issue licenses to contractors and specialty contractors. The Department has adopted regulations defining 37 categories of specialty contractor.[21]  A contractor who installs steel towers or pylons is considered a steel erection contractor.[22] The superior court concluded that the 49-foot tower for the wind turbine qualifies as a steel tower or pylon under this statutory framework and that AWI was therefore required to be registered as a steel erection contractor.

The Daggetts do not contest that the wind turbine tower falls within this category or that an installer of steel towers generally is required to register as a steel erection contractor. Instead they argue that AWI was exempt from registration under

---

[20]    "A person may not submit a bid or work as a contractor until that person has been issued a certificate of registration as a contractor by the department." AS 08.18.011(a).   "Department" is defined as "the Department of Commerce, Community, and Economic Development, unless the context indicates otherwise." AS 08.18.171(5).

[21]    *See* 12 AAC 21.200 (2010).

[22]    12 AAC 21.510.  *See* 12 AAC 21.200 (31) (listing "Steel Erection Contractor" as a type of specialty contractor).

AS 08.18.161(5), which provides that the chapter governing contractor registration "does not apply to . . . the sale or installation of finished products, materials, or articles of merchandise that are not actually fabricated into and do not become a permanent, fixed part of a structure." The Daggetts argue that the wind turbine kit was a finished product and AWI "would simply have been putting the pieces together and installing [the turbine] on Feeney's property."

We have discussed this exemption only once before, in *Industrial Power & Lighting Corp. v. Western Modular Corp.*[23] Western Modular supplied pre-fabricated homes that Industrial Power assembled on-site.[24] We decided that AS 08.18.161(5) did not apply to Western Modular because the section was "aimed at a supplier who actually installs his [or her] products," whereas "Western Modular had no installation responsibilities" because the homes were installed by Industrial Power.[25] Instead we concluded that Western Modular was exempt under a different section of AS 08.18.161 that covered suppliers who "only furnished materials" without installing them.[26]

The Daggetts read *Industrial Power* to support their contention that AWI's wind turbine installation falls under the finished products exemption. But the Daggetts' focus on this language is misplaced. In *Industrial Power* we inquired whether the supplier installed the product in order to distinguish between two exemptions with otherwise similar language.[27] We did not suggest that *any* supplier who installed a

---

[23]     623 P.2d 291, 294-95 (Alaska 1981).

[24]     *Id.* at 292-93.

[25]     *Id.* at 295.

[26]     *Id.* at 294; *see* AS 08.18.161(7).

[27]     *Indus. Power*, 623 P.2d at 295.

product would be exempt under AS 08.18.161(5); to do so would let the exception swallow the rule.

Instead, as Feeney suggests, we must evaluate the provision's full language, which exempts "the sale or installation of finished products . . . that are not actually fabricated into and do not become a permanent, fixed part of a structure."[28] Thus the question is not only whether the turbine was to be installed but whether a turbine kit is a "finished product[]" that "become[s] a permanent, fixed part of a structure." This language and related elements of the statutory structure indicate that a turbine becomes a permanent, fixed structure within the meaning of this provision.

Alaska Statute 08.18.171(4) defines "contractor" to include someone who constructs or alters "any type of fixed structure, including . . . erection of scaffolding." A wind turbine affixed to a 49-foot tower is clearly a fixed structure in the plain sense of the phrase, and towers have been recognized as "structures" in other statutory contexts such as zoning codes.[29] Moreover, when scaffolding, which is inherently temporary, is considered a fixed structure under AS 08.18.171(4), a more permanent structure such as a wind turbine must also be considered a fixed structure. As a fixed structure, the pole and turbine would not fall under AS 08.18.161(5)'s exemption for finished products that are not part of a fixed structure when installed.

The Daggetts point out that the turbine system is "a free[-]standing, finished product that [is] not 'fabricated' into another structure," perhaps implying that a fixed structure product like a wind turbine is exempt because it is not made *part of* another

---

[28] AS 08.18.161(5).

[29] *See Pruitt v. City of Seward*, 152 P.3d 1130, 1133 (Alaska 2007) (citing Seward City Code § 15.10.140, which defines "structure" as "[a]nything constructed or erected on the ground or attached to something having location on the ground, including, but not limited to, buildings, towers, and sheds," but excluding short walls).

structure.[30]  But this interpretation is unsustainable.  The provision must be read as exempting the installation of finished products that do not become a permanent, fixed part of a structure *or* do not become permanent, fixed structures themselves.  Feeney notes that the construction of an entire house would be exempted from all contractor regulations under the Daggetts' interpretation because the house does not become part of another fixed structure.  Such a result would be nonsensical and would undermine much of the chapter governing contractors, which was clearly intended to apply to the construction of new houses and other structures in addition to modification of existing structures.[31]  Alaska Statute 08.18.161(5)'s finished products exemption does not apply to the Daggetts because we have already determined that the turbine becomes a fixed structure.

Our decision in *Industrial Power* confirms this interpretation of the finished products exemption.  There we held that Industrial Power, the contractor that assembled and installed the prefabricated houses on-site, *was* required to register as a contractor.[32]  The wind turbine kit that would have been assembled and installed by AWI to become

---

[30]  At oral argument James Daggett argued that among steel professionals, "fabricate" has a specialized meaning:  "to construct from raw materials" by cutting, welding, and drilling them to build a structure.  He considered AWI's work to be simple "assembly," using hand tools, of components fabricated by the manufacturer.  But AS 08.18.161(5) applies to all kinds of finished products, so a specialized meaning, even if proven, would not apply.  *See N. Alaska Envtl. Ctr. v. State, Dep't of Nat. Res.*, 2 P.3d 629, 634 (Alaska 2000) ("[W]e construe terms according to their common usage, unless a term has acquired a peculiar meaning due to statutory definition or judicial construction.").  Although it does not affect our decision, it is understandable that, based on his experience, James was familiar with a more specialized definition.

[31]  *See* AS 08.18.171(13) (defining "new home" for purposes of title 8, chapter 18).

[32]  *Indus. Power*, 623 P.2d at 295-97.

a free-standing, fixed structure is analogous to the prefabricated houses in that case, which were similarly assembled and installed by Industrial Power to become individual, free-standing structures.

For these reasons we agree with the superior court that the finished products exemption does not apply and that AWI was required to register as a steel erection contractor.

### 2. Assuming it is relevant to our statutory interpretation, the superior court did not clearly err in rejecting the Daggetts' claim that renewable energy contractors were, in practice, exempted by the State.

The Daggetts maintain that a state official told them renewable energy installers did not need to be registered as contractors, impliedly arguing that the State had interpreted the finished products exemption to include renewable energy installation. They argue that the superior court erred in discounting Nadia's testimony on this point and dispute the court's finding that they knew AWI needed to be licensed.

Assuming it is relevant to our interpretation, whether the State interpreted contractor registration requirements to exclude renewable energy contractors at the time of the contract is a question of fact; we therefore review the superior court's findings for clear error.[33] Nadia testified at trial that it was industry standard for renewable energy contractors not to carry a license and that AWI's competitors who also installed wind turbines were not licensed at the time. She also testified that a state employee in Juneau told her there was no NAICS code for renewable energy, and that in late 2010 a state licensing inspector told her that renewable energy contractors would need to be licensed beginning in 2011.

---

[33]     *Diblik v. Marcy*, 166 P.3d 23, 25 (Alaska 2007) (citing *Keturi v. Keturi*, 84 P.3d 408, 412 (Alaska 2004)).

It was the superior court's task to determine the credibility of these statements and weigh them against other evidence.[34] The court heard no testimony by representatives of the State, nor does the record reveal any other evidence of the State's position at the time. On the other hand, evidence suggesting the Daggetts knew AWI needed to be registered included the contract's affirmation that AWI was licensed and Daggett LLC's previous specialty contractor registration.

The superior court evidently found the written contract and the Daggetts' actions more persuasive than Nadia's testimony about AWI's need to be registered. We have explained that "[t]he superior court's 'factual findings enjoy particular deference when they are based "primarily on oral testimony, because the trial court, not this court, performs the function of judging the credibility of witnesses and weighing conflicting evidence." ' "[35] The court did not clearly err in discounting testimony that renewable energy installers were not required to be registered or in concluding that there was no in-practice exemption from the registration requirement.

## B. AWI's Counterclaim For Breach Is Barred By Statute.

The superior court held that AWI was barred by statute from bringing a counterclaim against Feeney for breach of contract. Under AS 08.18.151 an unregistered contractor who was required to be registered may not bring a breach-of-contract claim:

> A person acting in the capacity of a contractor . . . may not bring an action in a court of this state . . . for breach of a contract for which registration is required under this chapter without alleging and proving that the contractor . . . was a

---

[34] *William P. v. Taunya P.*, 258 P.3d 812, 814 (Alaska 2011) (citing *Misyura v. Misyura*, 242 P.3d 1037, 1039 (Alaska 2010)).

[35] *In re Adoption of S.F.*, 340 P.3d 1045, 1047 (Alaska 2014) (quoting *William P.*, 258 P.3d at 814).

registered contractor . . . at the time of contracting for the performance of the work.

Because AWI did not fall under the finished products exemption of AS 08.18.161(5), it was required to register as a specialty steel contractor in order to install wind turbines. The plain language of AS 08.18.151 therefore prohibits AWI's counterclaim.

The Daggetts contend that, because it involves the forfeiture of a claim, AS 08.18.151 should be construed narrowly so that it would not apply here. They point to *Industrial Power*, where we "decline[d] to give the statute an expansive reading" because "AS 08.18.151 causes the forfeiture of an otherwise valid claim."[36] But even under this narrow reading of section .151, we concluded that Industrial Power, because it was assembling and installing prefabricated homes, was required to be registered and thus was barred from bringing a breach of contract claim.[37] As we discussed above in Section A.1, AWI is in a position analogous to that of Industrial Power, not Western Modular, the supplier of the prefabricated homes. We therefore conclude that AS 08.18.151 bars AWI's counterclaim.

**C.    The Superior Court Did Not Err In Declining To Address AWI's Claim For Wrongful Rejection Under The UCC.**

The Daggetts argue that the superior court erred by declining to address AWI's potential remedies for wrongful rejection under the Uniform Commercial Code (UCC) when AWI raised wrongful rejection as an affirmative defense.[38] They point to

---

[36]     623 P.2d at 294.

[37]     *Id.* at 295-97.

[38]     Although the Daggetts did not raise this issue in their statement of points on appeal, they did raise it before the superior court and discussed it adequately in their appellate briefing; Feeney also briefed the issue. We therefore consider the merits of the argument. *See Bylers Alaska Wilderness Adventures Inc. v. City of Kodiak*, 197 P.3d

(continued...)

provisions of the UCC incorporated into AS 45.02.703, .706, and .708, which provide a seller with specific remedies in the case of wrongful rejection by the buyer. They argue that these remedies are separate from the breach-of-contract counterclaim and are not barred by AS 08.18.151 even if AWI unlawfully failed to register as a specialty contractor.

But Feeney correctly notes that the Daggetts have failed to cite any legal authority for their proposition that AS 08.18.151 does not bar claims for these remedies under the UCC. In fact, AS 08.18.151 bars an unregistered contractor from "bring[ing] an action . . . for the collection of compensation for the performance of work or for breach of a contract." An action for remedies under the UCC qualifies as "an action . . . for the collection of compensation" within the meaning of this statute, and there is no indication that the UCC remedies were intended to displace the barrier to suit created by AS 08.18.151.[39] Accordingly AS 08.18.151 bars the Daggetts' claim for UCC remedies, and the superior court did not err in failing to consider this defense.

### D. The Setoff Calculation Is Clearly Erroneous.

After concluding that Feeney was entitled to the return of his down payment, the superior court concluded that AWI was entitled to an equitable setoff compensating it for out-of-pocket and incidental expenses. Although the court did not abuse its discretion by awarding a setoff based on the costs incurred by AWI, the setoff calculation was clearly erroneous.

---

[38] (...continued)
199, 205 n.10 (Alaska 2008) (citing *Native Vill. of Eklutna v. Bd. of Adjustment for the Municipality of Anchorage*, 995 P.2d 641, 646 (Alaska 2000)) (considering claims that were raised below and briefed by both parties).

[39] *See* AS 45.01.113(b) (providing that relevant provisions of Alaska law supplement the UCC "[u]nless displaced by the particular provisions of the code").

### 1. It was not an abuse of discretion to base the setoff on costs incurred by AWI instead of on benefits received by Feeney.

Feeney successfully voided the contract on the ground of misrepresentation. His complaint correctly noted that AWI would be entitled to an equitable setoff. The superior court determined AWI's setoff based on the costs incurred by AWI. As we have explained, actions for compensation by an unregistered contractor are normally barred by AS 08.18.151. But in *Sumner Development Corp. v. Shivers*, we held that in the interests of equity, an unregistered contractor may "offset[] as a defense sums which would otherwise be due him [or her] under the illegal contract."[40] We adopted this principle because awarding the return of the property owner's full payment would create a "windfall" if the owner also retained the benefit of the work completed prior to rescission.[41] "Allowing setoff achieves an equitable result of compensating the owner only if the damages caused are greater than the benefit received."[42]

Because "rescission involves restoring the parties to their 'pre-contract position[s], at least as far as [it is] possible to do so,' "[43] Feeney argues that any setoff under this principle is limited to the benefit the owner received — i.e., the amount of "windfall" that the owner would receive if allowed to retain the completed work in addition to receiving full reimbursement. He argues that he received no benefit from the work completed before the contract was cancelled. But our decision in

---

[40]    517 P.2d 757, 764-65 (Alaska 1974) (quoting *S & Q Constr. Co. v. Palma Ceia Dev. Org.*, 3 Cal. Rptr. 690, 692 (Cal. Dist. Ct. App. 1960)).

[41]    *Id.* at 765-66.

[42]    *Id.* at 766.

[43]    *Watega v. Watega*, 143 P.3d 658, 666 (Alaska 2006) (alterations in original) (citing 1 DAN B. DOBBS, LAW OF REMEDIES § 4.8, at 676 (2d ed.1993)).

*Sumner* emphasizes that the setoff is intended to "achieve[] an equitable result" and compensate the contractor for "any sums which may be equitably due [it]."[44]

Because the award of a setoff is an equitable remedy,[45] we review the superior court's decision for abuse of discretion.[46] The court weighed the equitable considerations in the case, including its view that Feeney's pursuit of the licensing issue was "pretextual" and that he had "unilaterally 'cancelled' the [c]ontract" for other reasons and then sought "to justify this termination based on . . . AWI's non-licensed status." We defer to the court's factual determinations about Feeney's true reason for cancelling the contract, which do not appear clearly erroneous from the record.[47] Based on this factual determination, the superior court did not abuse its discretion in awarding an equitable setoff that compensated AWI for costs it incurred.

### 2. The setoff amount was based in part on an erroneous calculation.

The calculated setoff amount did not consider the profit actually made by AWI on resale. After the contract plans fell apart, AWI was able to resell the parts for a total of $37,054.52: the turbine and inverter were sold for $25,100.72 and the tower

---

[44]    *Id.* at 765-66.

[45]    *Id.* at 766.

[46]    *In re Estate of Fields*, 219 P.3d 995, 1002 (Alaska 2009), *as modified on denial of reh'g* (Dec. 16, 2009) (citing *Riddell v. Edwards*, 76 P.3d 847, 852 (Alaska 2003)).

[47]    *See Diblik v. Marcy*, 166 P.3d 23, 25 (Alaska 2007) (citing *Keturi v. Keturi*, 84 P.3d 408, 412 (Alaska 2004)). Indeed, the record supports the finding that Feeney cancelled the contract based on his neighbor's contention that the turbine violated local land-use covenants. Under the terms of the contract, Feeney expressly assumed the responsibility of ensuring that the installation complied with the covenants. As the superior court stated, Feeney "is not without unclean hands."

for $11,953.80. The court only briefly looked at profit to determine whether AWI was entitled to any setoff based on resale at a loss. Because the court calculated that AWI made a slight profit, it concluded that AWI was not entitled to resale damages. Under the superior court's calculation, where AWI supposedly paid $37,000 and received $37,054.52 for the parts, AWI's profit would have been $54.52. But this was incorrect: the supplier's invoice shows that AWI paid the wholesale price of $30,950 for the Wind Turbine Package, not the retail price of $37,000. AWI therefore made a profit of $6,104.52 when it sold the parts. Because the contract is rescinded, AWI is entitled to offset its costs, as the court concluded, but only to the extent that their costs are greater than the profit they gained. We therefore remand this case to the court to recalculate the setoff amount based on AWI's actual profit.[48]

### E. The Superior Court Did Not Err In Amending The Final Judgment To Assign Liability To The Daggetts And Standard Steel.

The Daggetts argue that it was procedurally improper to delay judgment on the question of liability and that the amended judgment is substantively incorrect.

#### 1. It was not an abuse of discretion to allow Feeney to move to amend the judgment after the Civil Rule 59(f) deadline.

The superior court's July 2013 opinion reserved judgment on whether Feeney could seek recovery of his down payment from anyone other than AWI, indicating that it would consider the question if AWI did not satisfy the judgment against it. The December 2013 final judgment expressly stated that, "[n]otwithstanding the requirements of Civil Rule 59(f)," Feeney could "seek to amend the judgment to include the remaining defendants" within 120 days if AWI failed to satisfy the judgment within

---

[48] We also note that the court's calculated total for out-of-pocket expenses appears to be $65 short.

90 days. The Daggetts argue that Rule 59(f) sets a "strict deadline" for motions to amend a judgment that the court was wrong to ignore.

Feeney counters that the Daggetts waived any objection to the timeline because they did not object to this amendment mechanism when he proposed it. An issue not timely raised below cannot be raised on appeal.[49] Feeney submitted the proposed final judgment suspending Rule 59(f) on October 29, 2013, and the court signed it on December 15, 2013. The Daggetts did not object to the amendment mechanism until May 6, 2014. Because the Daggetts did not timely raise their objection, it is waived. But even if the issue were properly before us, we would not disturb the superior court's decision.

Rule 59(f) requires a motion to amend a judgment to be served "not later than 10 days after the entry of the judgment," far sooner than the 120-day deadline here. But Alaska Civil Rule 94 states that the Civil Rules "are designed to facilitate business and advance justice" and allows the court to "relax[] or dispense[] with" any of the rules when it is "manifest to the court that a strict adherence to them will work injustice." The court's December 2013 final judgment stated that Rule 59(f) would not apply, and Rule 94 leaves such decisions to the superior court's discretion.[50]

The superior court chose to give AWI an opportunity to satisfy the judgment before considering whether the Daggetts or an entity owned by them could also be held liable for it. The court's decision did not deny the Daggetts due process. The

---

**49** *See Stephanie W. v. Maxwell V.*, 319 P.3d 219, 225-26 (Alaska 1995) (" '[A]n issue raised for the first time in a motion for reconsideration is not timely' and is therefore not preserved for appeal." (quoting *Stadnicky v. Southpark Terrace Homeowner's Ass'n*, 939 P.2d 403, 405 (Alaska 1997))).

**50** *See ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 134 (Alaska 2014) (reviewing a decision to enlarge time to file for attorney's fees under Rule 94 for abuse of discretion).

Daggetts were named as defendants in the original judgment; the delay did nothing to change their position in the case. The Daggetts had an opportunity to be heard on the issue of their personal liability, and they took that opportunity. Nor were the Daggetts prejudiced by the delay; if anything, the delay could have benefitted them by allowing AWI to satisfy the judgment before the court issued a judgment against the Daggetts in their personal capacity. Because the delay was reasonable and there was no prejudice to the Daggetts, the court's decision to relax the Rule 59(f) deadline was not an abuse of discretion.

### 2. It was not error to decide that the Daggetts and Standard Steel were liable to Feeney.

The superior court concluded that the Daggetts were personally liable to Feeney under the contract because they signed it as agents of an undisclosed principal, Daggett LLC. The Daggetts do not contest the court's factual finding that they acted as agents of an undisclosed principal,[51] nor do they contest the legal conclusion that agents of an undisclosed principal are generally liable on a contract with a third party.[52] Rather they argue that the court erred in applying these principles of agency law in this case because AS 10.50.265 protects members of an LLC from the liabilities of their LLC.

Alaska Statute 10.50.265 gives some protection to LLC members by providing:

---

[51] The Daggetts briefly challenge the superior court's finding that they entered into a contract with Feeney, arguing that Schreier was the relevant actor. But this argument does not affect our analysis because the superior court found that Schreier acted as a subagent of the Daggetts and, as such, that they were liable for his actions regardless of who actually signed the contract. To the extent that the argument is relevant, the superior court's findings on this point are not clearly erroneous.

[52] *See Jensen v. Alaska Valuation Serv., Inc.*, 688 P.2d 161, 163 (Alaska 1984) (citing RESTATEMENT (SECOND) OF AGENCY, §§ 321, 322 (AM. LAW INST. 1958)). *See also* 3A FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 1120 (2016).

> A person who is a member of a limited liability company . . . is not liable, solely by reason of being a member, under a judgment, decree, or order of a court . . . for a liability of the company to a third party, whether the liability arises in contract, tort, or another form, or for the acts or omissions of another member, manager, agent, or employee of the company to a third party.

The Daggetts mistakenly read this statute to provide "complete protection" against personal liability for members of an LLC. Based on the statute's language protecting against liability arising "in contract . . . or another form," the Daggetts argue that AS 10.50.265 protects them against liability both on the contract and in restitution under the rescinded contract. And they contend that the provision protecting against liability "for the acts or omissions of another member, manager, agent, or employee" encompasses all the actions and relationships in this case.

Although AS 10.50.265 does provide some protection for limited liability company members, it is not a blanket ban on all possible liability for members. The plain language of the statute protects members only against liability to which they are subject "*solely* by reason of being a member."[53] Where a limited liability company member's liability arises from the member's own actions, the statute provides no protection.[54] Here the superior court found that the Daggetts were liable to Feeney not in their capacity as members of Daggett LLC but instead because they acted as agents

---

[53]     AS 10.50.265.  (Emphasis added.)

[54]     AS 10.50.265 protects a member from liability that arises from "the acts or omissions of *another* member," not of the member personally.  (Emphasis added.)  *Cf. Weber v. U.S. Sterling Sec., Inc.*, 924 A.2d 816, 823-24 (Conn. 2007) (holding that a similar statute did not bar personal liability of limited liability company members for their own acts).

of Daggett LLC in executing a contract for an undisclosed principal. Therefore AS 10.50.265 does not preclude their liability.

Turning to Standard Steel's liability as the successor to AWI, we decline to consider the merits of this question because the Daggetts do not have standing to contest it. Alaska Statute 22.20.040(a)(2) mandates that "a corporation, either public or private, shall appear by an attorney in all cases unless an exception to the corporation's appearance by an attorney has been explicitly made by law." In *Pister v. State, Department of Revenue* we applied this statutory restriction, explaining that when Pister filed a pro se appeal on behalf of himself and two corporations, the corporate entities "were . . . dismissed as appellants [until] an attorney filed an entry of appearance on behalf of all appellants."[55] The Daggetts represent themselves in this appeal and therefore cannot represent Standard Steel or, for that matter, AWI. Because the Daggetts may not represent Standard Steel in litigation under AS 22.20.040, the procedural leniency otherwise afforded to self-represented litigants is not available here,[56] and the Daggetts' appeal may not be construed as an appeal on behalf of Standard Steel.[57]

---

[55] 354 P.3d 357, 361 n.9 (Alaska 2015) (citing AS 22.20.040(a)(2)).

[56] *See Lawson v. Helmer*, 77 P.3d 724, 729 (Alaska 2003) (citing *Kaiser v. Sakata*, 40 P.3d 800, 803 (Alaska 2002)) (explaining that "we relax some procedural requirements for a pro se litigant where the litigant has made a good faith attempt to comply with judicial procedures").

[57] The Daggetts may of course defend and raise claims in their individual capacity. *See St. Paul Church, Inc. v. Bd. of Trs. of Alaska Missionary Conference of the United Methodist Church, Inc.*, 145 P.3d 541, 559-60 (Alaska 2006). And in their capacity as agents of AWI, they may defend themselves against personal liability using the same defenses that would be available to Daggett LLC d/b/a AWI. RESTATEMENT (SECOND) OF AGENCY § 334. But this does not allow them to raise any defense that would be available only to Standard Steel.

## V.   CONCLUSION

For the reasons explained above, we AFFIRM in part, REVERSE in part, and REMAND to the superior court to redetermine the setoff amount.